**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-cr-236-JDB** |
| | : | |
| **FEDERICO GUILLERMO KLEIN,** | : | |
| **also known as "Freddie Klein,"** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER AND**
**REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR EXCLUSION OF TIME**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion for Review and Revocation of Detention Order. Defendant Klein's motion fails to establish any legal or factual basis for this Court to revoke the detention decision by the Magistrate Court. The United States also respectfully submits this reply to the defendant's Opposition to the United States Motion for Exclusion of Time.

A grand jury of this Court found probable cause to return an indictment charging Klein with a crime of violence, that is, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b), for his assault with a dangerous weapon on federal and local police officers who were defending the U.S. Capitol from insurrectionists on January 6, 2021. Klein was also charged by way of indictment with Civil Disorder, in violation of 18 U.S.C § 231(a)(3), and Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18 U.S.C. §§ 1512(c)(2) and 2, both of which are felonies and both of which involved Klein's use of a dangerous weapon, a police riot shield. Accordingly, Klein has

been charged with both a crime of violence and using a dangerous weapon during his violent and enthusiastic participation in a riotous mob that stormed the Capitol Building on January 6, 2021, thereby subjecting him to detention under 18 U.S.C. § 3142(f)(1)(A) and § 3142(f)(1)(E).  The United States additionally submits that Klein is a present and ongoing danger to the community, and there are no conditions or combination of conditions that would reasonably assure the safety of the community pursuant to 18 U.S.C. § 3142(e).

Finally, the United States' request for a 60-day exclusion of time under the Speedy Trial Act does not violate the defendant's substantive Due Process rights.  Klein's detention under the Bail Reform Act is consistent with both the deadlines and the exclusions provided in the Speedy Trial Act, making his detention regulatory in nature.  The brief length of his detention to-date is non-punitive and comports with substantive Due Process.

The government respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention and the motion to exclude time.

## Background

### The Attack on the United States Capitol on January 6, 2021

The United States Capitol, located at First Street Southeast, Washington, D.C., is secured 24 hours a day by the U.S. Capitol Police (USCP).  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized individuals with appropriate identification are allowed access inside the Capitol Building.

On January 6, 2021, the exterior plaza of the Capitol was also closed to members of the public, and a joint session of the United States Congress convened inside.  During the joint session,

elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which had taken place on November 3, 2020.  The joint session began at approximately 1:00 p.m.  Then-Vice President Michael Pence was present and presiding in the Senate chamber.

While the joint session was underway, a large crowd gathered outside the Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the Capitol Building, and USCP were present and attempting to keep the crowd away from the Capitol Building and the proceedings underway inside.  Officers from the Metropolitan Police Department of the District of Columbia ("MPD") also responded to assist USCP in protecting the Capitol. Between 1:00 p.m. and 2:00 p.m., while the joint session continued to work to certify the election results, individuals in the crowd forced their way through, up, and over the barricades and police officers to the exterior façade of the Building.  By 2:00 p.m., the crowd forced entry into the Capitol Building, including by breaking windows and by assaulting members of both USCP and MPD, as others in the crowd encouraged and assisted those acts.

At approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including Vice President Pence, were instructed to – and did – evacuate the chambers.  Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m.  Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During the violent protests, many individuals were armed with weapons including bats, pepper spray, sticks, zip ties, as well as bulletproof vests and anti-tear gas masks.  Other individuals

stole items from officers protecting the Capitol – including pepper spray and riot shields – and turned those items into makeshift weapons used against the officers. Over 100 law enforcement officers reported being assaulted or injured by this violent mob while attempting to protect the Capitol and the individuals inside of the building. These assaults occurred both inside the Capitol, as well as on the steps just outside the Capitol Building and throughout the grounds of the Capitol.

### Klein's Violent Conduct and Officer Assaults on January 6, 2021

The Lower West Terrace, which is a widely recognizable area of the Capitol Building, is located directly in the front-center of the building, facing the Washington Monument. The Lower West Terrace is a very visible area of the Capitol Building that, in public perception, is often used for symbolic or patriotic events, such as presidential inaugurations or the "Capitol Fourth" concert that is annually held on the Fourth of July. Indeed, on January 6, 2021, the Lower West Terrace was undergoing preparation for the inauguration of now-President Biden. Scaffolding had been erected for the media, and stairs, risers, and other flooring was in place to create the stage area upon which the inauguration would take place.

In the center of the Lower West Terrace is an archway with a short set of stairs that leads to a set of double doors; those doors permit entrance directly into the Capitol Building.[1] At around 2:30 p.m., a large group of MPD and USCP officers assembled to protect the Lower West Terrace entrance from an advancing and violent mob. That specific entrance was the site of some of the heaviest violence on January 6, 2021, as the rioters battled with police officers on-and-off from

---

[1]     Since January 6, 2021, this area has become colloquially known as "the tunnel." On January 6, 2021, the stairs leading from the Capitol doors down to the Lower West Terrace had been covered by a platform so that the tunnel floor was flush. At the entrance to the tunnel, stairs then led down to the Lower West Terrace itself. In the past, President-elects, including now-President Biden, walked through the Lower West Terrace entrance doors and the tunnel, and then down the stairs to the inauguration stage.

approximately 2:40 p.m. to 5:15 p.m.  Over a period of about two-and-a-half hours, groups of rioters came in waves and gathered in the archway and tunnel as they attempted to violently breach the police line and gain entrance into the Capitol.  On multiple occasions throughout that period, rioters overran the archway and physically battled with police officers inside the tunnel, directly at the Capitol threshold.  At other times, officers were able to push the group of rioters out of the tunnel – away from the doors – and out onto the Lower West Terrace.

As detailed in the Complaint (ECF No. 1), which is incorporated herein by reference, Klein placed himself in the thick of the violence aimed at breaking through the center doorway of the Lower West Terrace to gain entrance to the Capitol Building.  He was among the first wave of rioters to enter the center archway and attempt to breach the door; he first entered the archway at approximately 2:43 p.m. and formed part of the mob inside the tunnel battling officers.  Klein was not a mere bystander, however, and used physical violence against a line of police officers who were protecting the entrance.  His individual participation in the larger mob amplified the overall violence and dangerousness of the day.  Klein remained inside the tunnel until approximately 3:21 p.m., when officers were able to push the first wave of rioters out of the tunnel and back out onto the terrace.

While inside the tunnel, Klein made his way to the front of the mob to fight directly at the doors to the Capitol Building where a line of officers had formed to protect the entrance.  He ignored police orders to "back up," and repeatedly attempted to break through the line, including by engaging in hand-to-hand violence against police officers while wielding an apparently stolen police riot shield.  During the approximately thirty minutes that Klein personally spent trying to breach the police line, he was captured on the Body Worn Camera ("BWC") of multiple officers.

5

At approximately 2:55 p.m., BWC footage showed him at the front of the crowd reaching out with his hand, seemingly attempting to grab something near the police line.  Five minutes later, at approximately 3:00 p.m., Klein was captured ignoring orders to "Back up" and "Let it go."  Instead of complying, Klein shoved a riot shield in between the Capitol Building doors, preventing officers from closing them.

Despite the police orders and the obvious and relentless violence occurring around him, Klein continued his efforts to break into the Capitol Building.  The evidence establishes that for an additional fifteen minutes, Klein remained at the front of the mob battling the officers who were protecting the entryway.  At approximately 3:15 p.m., Klein was again captured on BWC fighting with officers and still holding the apparently stolen police riot shield.  At that point, Klein used the riot shield to assault the front-line officers by violently shoving the shield into their bodies.  Only after an officer deployed a chemical irritant did Klein finally leave the front line and move to the back of the crowd.

Open-source videos also confirmed that Klein was in the tunnel physically fighting against the front line of officers.  Notably, one video captured Klein encouraging other rioters to attempt to breach the Capitol by shouting, "We need fresh people, we need fresh people" multiple times.  At approximately 3:21 p.m., after approximately *thirty minutes* of what can only be described as hand-to-hand combat, the officers at the doorway were finally able to clear the tunnel of the first wave of rioters; Klein was forced out of the tunnel with that group.  However, even after being forced out of the tunnel, he lingered on the Lower West Terrace with the mass of rioters who

remained there.  While out on the Terrace, Klein was again captured on video hindering an officer

seeking to help another officer who had been dragged into the mob on the Lower West Terrace.[2]

### Procedural History

Klein was initially charged by Complaint with: [1] Civil Disorder, in violation of 18 U.S.C.

§ 231(a)(3); [2] Obstruction of an Official Proceeding (Aiding and Abetting), in violation of 18

U.S.C. §§ 1512(c)(2) and 2; [3] Assaulting, Resisting, or Impeding Certain Officers Using a

Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); [4] Knowingly Entering or

Remaining in any Restricted Building or Grounds Without Lawful Authority in violation of 18

U.S.C. §§ 1752(a)(1), (2), and (4) and; [5] Disorderly Conduct and Physical Violence on the

Capitol Grounds, in violation of 40 U.S.C. §§ 5104(e)(2)(D) and (F). (ECF No. 1).  Klein was

arrested on March 4, 2021; the Court held his initial appearance on March 5, 2021, at which time

the United States requested his detention.  Consistent with the written memorandum filed by the

United States on March 9, 2021 (ECF No. 10), the government sought a detention hearing pursuant

to 18 U.S.C. § 3142(f)(1)(A) [Crime of Violence] and § 3142(f)(1)(E) [Dangerous Weapon].

On March 9, 2021, Magistrate Judge Zia Faruqui conducted a detention hearing and found

that the United States established by clear and convincing evidence that no combination of

conditions of release would reasonably assure the safety of any other person and the community.

(*See* ECF No. 11)

On March 19, 2021, a federal Grand Jury returned an eight-count indictment (ECF No. 12)

against Klein, charging him with the same three felonies – one being a crime of violence – and

five misdemeanors as charged in the Complaint.  On March 25, 2021, Klein was arraigned on the

---

[2]       A few moments later, however, Klein was captured attempting to aid an officer, who had been dragged down
the steps to the Lower West Terrace, back up the steps towards the tunnel.

indictment and entered a plea of not guilty.  On March 31, 2021, he filed the instant motion to review and revoke the order of detention.

**Argument**

**1.  Standard of Review**

Although the D.C. Circuit has not yet addressed the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review.  *See United States v. Hunt*, 240 F.Supp.3d 128 (D.D.C. 2017).  The United States and the defendant agree that this is the appropriate standard of review.  (Def. Mot. at 4).

**2.  The Defendant is Subject to Detention Pursuant to 18 U.S.C. § 3142(f)(1)(A) and § 3142(f)(1)(E)**

Klein is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(A) and § 3142(f)(1)(E) because he has been charged with both a crime of violence as well as two additional felonies that were committed using a dangerous weapon.  Specifically, in Count Three of the indictment, Klein is charged with a crime of violence in violation of 18 U.S.C. § 111(a)(1) and (b), where the grand jury found that, "using a deadly or dangerous weapon, that is, a riot shield," Klein "did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer and employee of the United States."[3]  (ECF No. 12).  He is also charged with another two felonies in Counts One and Two of the indictment: Civil Disorder, in violation of 18 U.S.C § 231(a)(3); and Obstruction of an Official Proceeding (Aiding and Abetting) in violation of 18 U.S.C. §§ 1512(c)(2) and 2.  Specifically, in committing these additional felonies, Klein used the stolen police riot shield to engage in hand-to-

---

[3]      The United States relies only on 18 U.S.C. §§ 111(a)(1) and (b) as a "crime of violence" in its request for detention pursuant to § 3142(f)(1)(A).  Contrary to the defendant's contention (Def. Mot. at 5), at no time in this case has the United States asserted that § 231(a)(3), § 1512(c)(2), or any of the charged misdemeanors are "crimes of violence" for purposes of § 3142(f)(1)(A).

hand combat with federal officers defending the Capitol Building, violently shoving at least one of the officers with the shield.

In support of his motion, the defendant claims that § 111(b) is not a crime of violence, arguing at length that the absence of the use or threatened use of physical force in the unenhanced statute § 111(a) disqualifies the offense from being considered a crime of violence.  (Def. Mot. at 8-10).  In so doing, the defendant ignores the overwhelming case law rejecting this very argument.  Indeed, every circuit to address this issue directly has found that § 111(b) is, in fact, a "crime of violence."

In *United States v. Taylor*, 848 F.3d 476 (1st Cir. 2017), the First Circuit Court of Appeals specifically found that § 111(b) was a "crime of violence" for purposes of § 924(c)(3), explaining that both of the enhanced versions of § 111 require the element of force.  To qualify as a "crime of violence," an offense must include the "use, attempted use, or threatened use" of "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).  Under that definition, the *Taylor* Court found that a "defendant who acts 'forcibly' using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal employee, or at least threatened the employee, with an object that, as used, is capable of causing great bodily harm."  848 F.3d at 494.  Noting that they were not writing "on a clean slate," in determining that § 111(b) is a crime of violence, the Court emphasized that "every court we are aware of that has considered the issue has found that it is because the elements of the enhanced offense require the use, attempted use, or threatened use of force capable of causing pain or injury." *Taylor*, 848 F.3d at 492-93, *citing United States v. Rafidi*, 829 F.3d 437, 445-46 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2147 (2017); *United States v. Hernandez - Hernandez*, 817

9

F.3d 207, 215 (5th Cir. 2016) (decided under Sentencing Guidelines § 2L1.2); *United States v. Green*, 543 F.App'x. 266, 272 (3d Cir. 2013) (decided under Sentencing Guidelines § 4B1.1); *United States v. Juvenile Female*, 566 F.3d 943, 948 (9th Cir. 2009) (decided under 18 U.S.C. § 16), *cert. denied*, 558 U.S. 1134 (2010).

Subsequent to the decision in *Taylor*, additional circuit courts have found that § 111(b) is a "crime of violence."  *See Gray v. United States*, 980 F.3d 264, 265 (2d Cir. 2020) ("The question presented is whether assaulting a federal officer under 18 U.S.C. § 111(b) is categorically a 'crime of violence.'  We join six other courts of appeals in holding that it is."); *United States v. Bullock*, 970 F.3d 210, 217 (3d Cir. 2020) (finding § 111(b) is "categorically a crime of violence" under the modified categorical approach); *United States v. Bates*, 960 F.3d 1278, 1287 (11th Cir. 2020) ("§ 111(b) categorically qualifies as a crime of violence under 924(c)'s elements clause."); *United States v. Kendall*, 876 F.3d 1264, 1270 (10th Cir. 2017) (concluding that § 111(b) constitutes a crime of violence), *cert. denied*, 138 S. Ct. 1582 (2018).  While the D.C. Circuit has not addressed the specific question of whether § 111(b) is a "crime of violence," undersigned counsel is not aware of any court that has concluded otherwise.  Nor does the defendant identify any case in which a court has concluded that § 111(b) is not a crime of violence.[4]

The defendant also argues that the police riot shield he used to violently shove the officers defending the Capitol is not a "dangerous weapon" for purposes of detention under §

---

[4]     The defendant's reliance on *United States v. Bennett*, 863 F.3d 679 (7th Cir. 2017), is inapposite.  (Def. Mot. at 12-14).  In concluding that an Indiana statue that prohibited resisting arrest while using a deadly weapon or inflicting bodily injury did not qualify as a "violent felony" for purposes of the Armed Career Criminal Act, 18 U.S.C. § 924(e), the Seventh Circuit consulted Indiana caselaw that specifically permitted conviction under that statute for nonviolent conduct.  *See Bennet*, 863 F.3d at 681 ("'inflicting bodily injury on or otherwise caus[ing] bodily injury to another person,' as defined by the Indiana courts, need not connote violence.").  Klein identifies no similar case law interpreting the violent conduct that § 111(b) necessarily encompasses.

3142(f)(1)(E), and therefore, he is not subject to detention under that provision.  Notably, the defendant cites to no caselaw to support his position, glosses over and relegates contrary precedent to a footnote (Def. Mot. at 16 n.11), and completely ignores the well-developed body of law establishing the vast array of items that may constitute a "dangerous weapon."  Instead, the defendant argues that a "reasonable inference" suggests that § 3142(f)(1)(E) was "intended to provide the government a detention hearing for defendants accused of non-violent crimes involving firearm-like weapons."  (Def. Mot. at 15-16).  There is no such inference under established law.

This issue was recently addressed specifically in the context of detention by Judge Lamberth in *United States v. Chansley*, No. 21-cr-03 (RCL), 2021 WL 861079 (D.D.C. Mar. 8, 2021).  In *Chansley*, the Court denied the defendant's motion to revoke the order of detention, explicitly rejecting Chansely's argument that the "spear" that he took into the Capitol Building was not a dangerous weapon but was, instead, merely a "flagpole" with a "spear finial."  The Court noted that,

> As used in Sections 111 and 113, Courts have consistently defined "dangerous weapon" as an object that is either inherently dangerous or is used in a way that is likely to endanger life or inflict great bodily harm.  *See United States v. Anchrum*, 590 F.3d 795, 802 (9th Cir. 2009); *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc); *United States v. Sturgis*, 48 F.3d 784, 787–88 (4th Cir. 1995); *United States v. Gibson*, 896 F.2d 206, 210 & n.1 (6th Cir. 1990); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam).  "Inherently dangerous" weapons are those that are "obviously dangerous" such as "guns, knives, and the like." *Smith*, 561 F.3d at 939 (quoting *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994)).  Conversely, "objects that have perfectly peaceful purposes may be turned into dangerous weapons" when used in a manner likely to cause bodily harm.  *United States v. Rocha*, 598 F.3d 1144, 1154 (9th Cir. 2010).

*Chansley*, 2021 WL 861079, at *7.  The United States submits that the police riot shield used by Klein to assault front-line officers at the Capitol is a dangerous weapon because it was used in a

manner likely to cause bodily injury.  In most circumstances, a police riot shield is a defensive

tool, designed to encourage peace and to protect the bearer from physical injury or other harm.  In

this circumstance, however, Klein used the riot shield offensively and turned the officers'

defensive tool into a weapon against them.  Indeed, the defendant did not merely hold the shield

in a defensive manner, as if protecting or defending himself from the officers, as the defense would

suggest.  (Def. Mot. at 16 n.11).  Rather, as can be observed in Figure 1 below, Klein stood amongst

a mass of rioters attempting to overtake the Capitol and rammed the riot shield with violent force

against the bodies of the police officers defending the Capitol.



(Figure 1)[5]

Figure 1 clearly captures the shield in Klein's hands, gripping the handles tightly, and the outside

of the shield facing and against an officer's body.  The force with which Klein shoved the shield

against the officer is also evident in Figure 1, which shows his face clenched and the veins in his

temple protruding from his efforts.  In addition, while the United States has not identified the

---

[5]      Figure 1 is a photographic still from an MPD officer's BWC during the events of January 6, 2021.  The same photograph was presented in the Complaint (ECF No. 1 at 8)

precise riot shield that Klein wielded against officers, the standard MPD and USCP-issued riot shield is approximately forty-eight inches tall and twenty-four inches wide, fully capable of causing bodily injury when used to strike a human being as Klein did on January 6, 2021.

In sum, Klein is subject to detention under § 3142(f)(1)(A) [Crime of Violence] and § 3142(f)(1)(E) [Dangerous Weapon].  He has been charged with § 111(b) for violently ramming an officer with a police riot shield while attempting to unlawfully enter the Capitol.  As eight circuit courts now agree, § 111(b) is a "crime of violence," making the defendant eligible for detention pursuant to § 3142(f)(1)(A).  Moreover, Klein has been charged with two additional felonies, Civil Disorder, in violation of § 231(a)(3), and Obstruction of an Official Proceeding (Aiding and Abetting), in violation of §§ 1512(c)(2) and 2, both of which he committed while using a police riot shield as a dangerous weapon.  He is therefore also subject to detention under § 3142(f)(1)(E).

### 3. There Are No Release Conditions or Combination of Release Conditions That Would Protect the Community from the Defendant if Released

The United States relies upon the arguments presented in its Motion for Detention, all of which are still applicable in this matter and are incorporated herein by reference.  (ECF No. 10).  In his motion, the defendant largely relies upon the newly decided *United States v. Munchel*, No. 21-3010, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021), to argue that his detention is improper.  (Def. Mot. at 16-18).  The defendant's reliance is misplaced.  If anything, *Munchel* supports the United States' request for Klein's continued detention.[6]

---

[6]     Indeed, *Munchel* recognized that the defendant's detention was permitted under 18 U.S.C. § 3142(f)(1)(E) where he was charged with two felonies while armed with a dangerous weapon, that is, a taser.  *Munchel*, 2021 WL 1149196, at *6 n.5.

The *Munchel* Court, reviewing the detention order of a mother-son duo who entered the Capitol on January 6, 2021, with zip ties and a taser, found that the District Court did not adequately address the dangerousness determination.  The circuit specifically focused on the District Court's insufficient justification for its dangerousness conclusion "notwithstanding the countervailing finding that 'the record contains no evidence indicating that, while inside the Capitol, [the defendants] vandalized any property or physically harmed any person,' and the absence of any record evidence that either [defendant] committed any violence on January 6." *Munchel*, 2021 WL 1149196, at *8 (internal citations omitted).  The Court instructed the District Court to consider these factors in its review on remand.  *Id.* ("If, in light of the lack of evidence that [the defendants] committed violence on January 6, the District Court finds that they do not in fact pose a threat of committing violence in the future, the District Court should consider this finding in making its dangerousness determination.")  Most significantly, in remanding the matter to the District Court, the Circuit specifically found that, "*those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way.*"  *Id.* (emphasis added) (citing *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) ("[W]here the future misconduct that is anticipated concerns violent criminal activity, no issue arises concerning the outer limits of the meaning of 'danger to the community,' an issue that would otherwise require a legal interpretation of the applicable standard.")).

Applying *Munchel* to the instant matter, the Court has more than ample basis to continue Klein's detention.  Here, Klein not only positioned himself in the midst of the Lower West Terrace

tunnel during some of the heaviest violence at the Capitol on January 6, 2021, he actively and eagerly contributed to that violence. USCP and MPD officers worked for almost three hours defending the Lower West Terrace entrance to the Capitol Building and spent much of that time under physical attack by a violent crowd – including Klein – that fanatically and repeatedly assaulted the officers. The officers were in full uniform, with clear and visible markings identifying themselves as law enforcement.

Klein moved to the very front of the group of rioters battling the police officers. He did not hang back. He did not consign himself to the role of a mere bystander or one who simply "cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 2021 WL 1149196, at *8. Rather, for more than thirty minutes, Klein actively engaged in violence and demonstrated a whole-hearted commitment to enter the Capitol and disrupt the legitimate functions of the United States Congress. He was persistent and unrelenting. In the videos capturing his actions, he never appeared to turn back or to reconsider engaging in violence with the police.

As noted above, Klein used an officer's riot shield as a weapon against the officers inside the tunnel, ramming it against their bodies in an attempt to overrun them. However, Klein also used the riot shield to aid the greater effort when he used the shield as a wedge in the door to the building, preventing the officers from closing the doors against the mob, as depicted in Figure 2, below.



(Figure 2)[7]

Thus, where the mob's mass assault was insufficient to overcome the officers, and when the officers' were on the verge of closing the doors to the Capitol Building, Klein took a riot shield and shoved it between the two doors, ensuring that the attack could continue.

Moreover, Klein's conduct did not stop at his own individual participation in the assault on the officers defending the Capitol. Indeed, Klein actively encouraged other rioters to take up the fight when others were faltering. He was captured on video shouting, "We need fresh people, we need fresh people," inciting other members of the crowd to attack the officers. Klein's attempts to not just aid the assault, but to coordinate the attack on the Capitol and lead another wave of rioters against the officers highlights his dangerousness. *See Munchel*, 2021 WL 1149196, at *8. Considering the above, the Court's holding in *Munchel* provides ample support for the defendant's continued detention.

---

[7]     Figure 2 is a photographic still from the BWC of an officer from January 6, 2021. This same photograph is contained in the Complaint. (ECF No. 1 at 7).

a.  <u>Nature and Circumstances of the Offenses Charged</u>

Klein's willing and enthusiastic participation in violence against police officers protecting a lawful proceeding of Congress, for which he is charged with multiple felonies – including a crime of violence – weighs heavily in favor of detention.  Not only was his individual conduct violent and dangerous, but his actions heightened and encouraged the overall violence and dangerousness of the day.

To support his argument that the nature and circumstances of his crime do not weigh in favor of detention (Def. Mot. at 18-20), the defendant turns to Chief Judge Howell's "offense characteristics," delineated as "guideposts in assessing, under 3142(g)(1), the comparative culpability of a given defendant in relation to fellow rioters."  *United States v. Chrestman*, 21-mj-218-ZMF, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021).  However, the defendant's conclusion that these factors support his release is unfounded.  Like *Munchel*, when the *Chrestman* factors, which, while not binding on the Court are nevertheless instructive, are applied to the instant case, there is substantial support for Klein's continued detention.

"The first differentiating factor, evident on the face of a criminal complaint, information, or indictment, is whether a defendant has been charged with felony or misdemeanor offenses. Felony charges are by definition more serious than misdemeanor charges; the nature of a felony offense is therefore substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense."  *Chrestman*, 2021 WL 765662, at *7.  A grand jury of this Court has charged Klein with three felonies and five misdemeanors.  (ECF No. 12).  The first factor, then, weighs in favor of the defendant's continued detention.

The next two factors suggested by Chief Judge Howell involve "defendant's conduct before January 6 in furtherance of the offenses charged." *Chrestman*, 2021 WL 765662, at *8. Specifically, these factors look to whether the defendant's behavior showed any kind of premeditation or planning for the violence that occurred on January 6, in contrast to those who were "caught up in the frenzy of the crowd." *Id.* To date, the United States has not discovered any evidence that Klein planned his assault on the officers in the Lower West Terrace. One witness who spoke with law enforcement, (hereinafter referred to as "Witness 4"), stated that Klein had plans to attend the "Stop the Steal" rally on January 6, 2021, and that Klein felt that as a Trump Administration political appointee it was his duty to be at the rally.[8] Witness 4 also told law enforcement that they were not aware that Klein had any plans for violence on January 6, 2021. Thus, the lack of evidence that Klein planned his attack on the Capitol does not weigh in favor of detention.

In contrast, the next two factors suggested by Chief Judge Howell weigh substantially in favor of the defendant's continued detention. "Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol." *Id.* The totality of the evidence against Klein demonstrates coordination with other members of the mob during the attack on the Capitol. He was not a singular violent presence, individually battling with officers in the Lower West Terrace tunnel for thirty minutes. Contrary to the defendant's assertion that he "only" wedged a riot shield between the doors of the Capitol (Def. Mot. at 19-20), the United States has proffered extensive evidence that Klein was an active, fervent, voluntary, and committed aggressor against the police

---

[8]     Witness 4 reported that they had a short romantic relationship with Klein.

officers attempting to stem the violence.  For thirty minutes he stood shoulder to shoulder with other rioters, shoving, pushing, and attacking officers who were defending the Capitol entrance. His actions as a whole evince coordination with others during the attack.  Moreover, Klein's multiple calls for reinforcements, that the mob needed "fresh people" to take up the fight, is direct evidence of his attempts to coordinate the activities of the crowd and to "amplify and assure the success of the breach of the Capitol."  *Chrestman*, 2021 WL 765662, at *8.

Klein's call for "fresh people" is also evidence of the de facto leadership role that he undertook, another factor that enhances the seriousness of the defendant's actions.  Indeed, Chief Judge Howell specifically discussed the import of such conduct in analyzing the §3142(g)(1) factors:

> Similarly, a defendant who assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct, *for example, by urging rioters to advance on the Capitol or to confront law enforcement,* may have inspired further criminal conduct on the part of others. The presence of either of these factors enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of his conduct.

*Chrestman*, 2021 WL 765662, at *8 (emphasis added). Moreover, Klein entered the Lower West Tunnel and immediately put himself at the front of the attack.  He stood at the literal threshold to the Capitol building and engaged in hand-to-hand combat with officers to cross that threshold, in effect leading a wave of rioters in an insurrection against Congress.  The dangerousness of such conduct cannot be overstated.

Next to consider are "a defendant's words and movements during the riot."  *Id.*  For example, Chief Judge Howell noted that a defendant who remained on the grounds of the Capitol was less brazen than one who breached the interior.  *Id.*  The defendant points to the fact that the United States has not proffered evidence that the defendant in fact entered the Capitol building as

a factor that weighs in his favor.  This assertion is gravely misleading.  That Klein did not enter the Capitol was not for his lack of trying.  Rather, it was only through the heroic efforts of law enforcement that Klein ultimately failed in his mission.

Contrary to available evidence, the defendant argues "it cannot fairly be said that Mr. Klein is alleged to have either 'injured, attempted to injure, or threatened to injure others;' or that he is alleged to have 'actively threatened or confronted federal officials or law enforcement.'" (Def. Mot. at 20) (quoting *Chrestman*, 2021 WL 765662, at *8).  For this statement to be accurate, one must either disregard the video and photographic evidence of Klein ramming a four-foot by two-foot stolen riot shield into the body of a police officer at the threshold of the Capitol, or one must suspend logic to believe such conduct does not equate to an "attempt to injure" or arise to "actively . . . confront[ing]" an officer. *Chrestman*, 2021 WL 765662, at *8.  Regardless, the defendant's argument is belied by the evidence establishing the totality of Klein's conduct on January 6, 2021.  Conduct that, when assessed against the factors suggested in *Chrestman*, shows a "a clear disregard for the law, concerted and deliberate efforts to undermine law enforcement, and an apparent willingness to take coordinated . . . and egregious actions to achieve his unlawful aims, all of which indicate that he poses a danger to the community."  *Id.* at *9.

Finally, the defendant contends that the government "speculates as to Mr. Klein's motives," claiming that "any suggestion of nefarious motive is contradicted by the government's own acknowledgement that the person alleged to be Mr. Klein is also captured on video *helping* officers at the Capitol."  (Def. Mot. at 20) (emphasis in original).  As an initial matter, this statement greatly mischaracterizes the evidence.  As laid out in the Complaint, (ECF No. 1 at 13-14), after spending thirty minutes battling officers in the tunnel and assaulting them with their own riot shield, and

after refusing to move out of the way of an officer who was attempting to rescue a fellow officer who had been pulled into the crowd, beaten, and tased by the mob, the defendant then appeared to offer a moments assistance to the injured officer clawing his way back to safety. There is no known evidence that the defendant helped officers – plural – at the Capitol. And, in any event, the defendant's "nefarious motive" for his conduct on January 6, 2021, had little to do with assaulting officers. The assault was a means to an end – the end being to stop the democratic function of the United States government.

It is important to note that in its Detention Memo, the United States stated that Klein was captured on BWC saying, "we just want a fair election." (ECF No. 10 at 5). However, upon reviewing the footage again, the United States is no longer certain that it was in fact Klein who made the statement. At the time of this statement, several males at the front of the mob were yelling at the officers. Klein was at the front of the mob. A male yelled at the officers, "we just want a fair election." At the same time, Klein was also captured on BWC speaking in the direction of the officers. A secondary review of the BWC footage indicates that it may have been a male adjacent to Klein, just off camera, that made the statement about a fair election at approximately the same time that Klein was also speaking.[9]

Even without the statement, however, Klein's intent was clear. According to Witness 4, Klein said that he was confident that the certification would not occur because Vice President Pence would overturn it. Thus, Klein was clearly aware of the import of the certification and hoped it would be stopped. Presumably upset when Vice President Pence did not stop the certification, Klein then took the law into his own hands and joined the mass of rioters at the

---

[9]       Within hours of discovering this, the United States disclosed the same to counsel for the defendant, including a clip of the relevant BWC footage.

Capitol; he went on to assault officers in an attempt to break into the Capitol at the exact same time that the certification proceeding was taking place.  During the thirty minutes Klein was observed in the tunnel, people in the mob around him called the officers traitors and yelled statements at the officers such as, "we want our country back," "we just want a fair election," and "this is our house."  Thus, the circumstances surrounding the defendant's conduct in the Lower West Terrace tunnel support the conclusion that his intent was exactly as perceived: to stop our democratic process and the Constitutionally mandated certification of a lawful election.

The first factor weighs heavily in favor of the defendant's continued detention.

> b.  <u>Weight of the Evidence against the Defendant</u>

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.  The evidence against Klein is overwhelming and is in large part captured on video.  In response, the defendant attempts to cast doubt on the identity of Klein as the individual committing these offenses.  In what can only be described as a red herring, the defendant points to the fact that the defendant was captured wearing two different hats on January 6, 2021, to argue that the identification of Klein is unreliable.  (Def. Mot. at 22).  However, the defendant's hat switch was captured on an open-source video posted to YouTube – the link to which was included in the Complaint (ECF No. 1 at 13) and therefore available for the defendant to view and analyze.  This video captured Klein emerge from the tunnel without a hat, look around consistent with one searching for an object, bend down as if he was picking up an object, and then place a different hat on his head.  The contention that the defendant's hat switch somehow discredits the identification of Klein not only ignores video evidence but also disregards the facial features, build,

hairstyle, and clothing of the defendant as captured on January 6, 2021.  Put simply, the defendant was not just identifiable because of the hats he wore.

In any event, the identification of the defendant was made by a former colleague who worked with Klein at the Department of State for approximately two years, and who observed him in-person multiple times a week.  Klein was also identified by a known individual who recognized him in the same open-source videos described in the Complaint.  (ECF No. 1).  Moreover, Witness 4 told law enforcement that they had communicated with Klein on January 6, 2021, and Klein told Witness 4 that he had been pepper sprayed and assaulted.  Cell phone call detail records corroborate that the two communicated on January 6, 2021.  Witness 4, who had been in a romantic relationship with Klein for several weeks, also identified Klein as the individual depicted in the open-source videos discussed in the Complaint (ECF No. 1).  Thus, three separate known individuals have now identified Klein.

The defendant attempts to further discredit the identification by pointing to the various vague and low certainty-level anonymous and identified tips the FBI received during the investigation that did not identify Klein (Def. Mot. at 22).  Specifically, the defendant complains that the cell site evidence obtained by the government to establish that Person 1 was not present at the Capitol building is not "conclusive" proof that Person 1 was not the individual identified as Klein.  Additional investigation has established that Person 1 has an alibi for the events of January 6, 2021.  Thus, the evidence against Klein is compelling, and the strength of the evidence weighs heavily in favor of detention.

c.  <u>Defendant's History and Characteristics</u>

The defendant contends that his limited criminal history, his strong ties to the area, his employment as a political appointee at the Department of State for four years during the Trump Administration, and his military service all weigh in favor of his release.  (Def. Mot. at 23-24). While these factors are to the defendant's credit and indicate that he likely is not a flight risk, "his more recent behavior surrounding the events of January 6 gives rise to significant concerns about the danger he may present to the community."  *Chrestman*, 2021 WL 765662, at *14.

Klein's conduct on January 6, 2021, reflects poorly on his character and demonstrates an utter disregard for the law and the legitimate functions of government, providing clear and convincing evidence that he is unwilling to follow lawful orders or to defer to the legal authority of the government.  When Klein assaulted federal officers in his attempt to storm the Capitol, he did so in the presence of hundreds of USCP and MPD officers who were working to protect both the constitutionally-mandated certification proceeding and the members of Congress duty-bound to hold that proceeding.  Klein blatantly assaulted officers in full view of other law enforcement, without even the pretense of following the law.  Inside of the tunnel, Klein also ignored multiple police commands to "Back up."  The presence of and the lawful orders of the USCP and MPD officers that day were immaterial to Klein's decision to engage in a violent insurrection to stop the legitimate functioning of the United States Government.

The dangerousness of Klein's participation in the mob that day is only amplified by the fact that, at that time, he was an employee of the Department of State, with an obligation to uphold the Constitution.  By law, federal employees are required to take an oath of office, swearing to "support and defend the Constitution of the United States against all enemies, foreign and

domestic..." 5 U.S.C. § 3331.  Presumably Klein took that same oath of office when he entered federal employment.  Klein demonstrated his contempt for that oath, the democratic and peaceful transfer of power inherent in our government, and for the Constitution itself when he assaulted officers and attacked the Capitol building to stop the certification of a lawful election.  By his actions on January 6, 2021, Klein abdicated his responsibilities to the country and the Constitution. Despite the trust the country and government placed in Klein's character, stability, trustworthiness, reliability, discretion, honesty, judgment, and unquestionable loyalty to the United States,[10] Klein's behavior revealed that his true allegiance lies elsewhere.  Rather, Klein's actions established that his own personal beliefs override the rule of law and that he will readily resort to violence to halt the legitimate functions of the United States government with which he disagrees. Such blatant disregard of the law and the valid authority of our government, along with his indifference to keeping his own oath weigh in favor of detention.  If Klein is unwilling to obey orders while in full view of law enforcement, or to conform his behavior to the law when he disagrees with it, despite his oath to the Constitution, it is unlikely that he would adhere to this Court's directions and release orders.

The defendant contends that the above facts and argument do "not address the history and characteristics of the defendant."  (Def. Mot. at 24).  However, the United States would submit that a defendant's respect for the rule of law and his willingness to abide by a lawful government order goes directly to his character.  Moreover, Courts have recognized that a "Court's finding as to [a defendant's] potential compliance is relevant to the ultimate determination of 'whether there

---

[10]     *See* U.S. Department of State, Bureau of Diplomatic Security, Security Clearances, at https://www.state.gov/security-clearances (last visited Apr. 5, 2021) (listing requirements for Top Secret security clearance).

are conditions of release that will reasonably assure ... the safety of any other person and the community.'" *Munchel*, 2021 WL 1149196, at *5; *see also United States v. Hir*, 517 F.3d 1081, 1092-93 (9th Cir. 2008) (explaining that release conditions require "good faith compliance" and that the circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the defendant] would not comply...with the proposed conditions"); *United States v. Tortora*, 922 F.2d 880, 886–90 (1st Cir. 1990). Accordingly, this factor weighs substantially in favor of detention.

### d. Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of Klein's continued detention. Frankly, it is difficult to fathom a more serious danger to the community—to the District of Columbia, to the country, or to the fabric of American Democracy—than the one posed by someone who knowingly and eagerly engaged in a violent insurrection to occupy the United States Capitol and abort the certification of a lawful and fair election. Every person who was present without authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to law enforcement, the United States Vice President, Members of Congress, and the peaceful transfer of power. Klein's specific conduct aggravated that chaos and danger.

The defendant's highly public assault of officers at the Capitol Building, his use of a police riot shield as an offensive weapon against officers, and his call to recruit others to break the law and join in the attempt to stop the democratic process illustrate his danger to the community. This danger is only amplified by his position as a federal employee, sworn to uphold the very Constitution he was attacking, at the time of the assaults. *See Chrestman*, 2021 WL 765662, at

26

*15 ("Nearly as significant is defendant's use of force to advance towards the Capitol and his use of words to lead and guide the mob in obstructing the police and pushing against police barriers").

The defendant again turns to *Munchel* to bolster his argument that he is not a danger to the community because the unique circumstances of the January 6, 2021 certification no longer exist. (Def. Mot. at 26).  This conclusion entirely misses the point of the circuit's holding in *Munchel*.  Indeed, following the defendant's logic, no one who was charged with participating in the January 6, 2021 insurrection could be detained because the specific circumstances unique to January 6, 2021 no longer exist.  *Munchel* expressly refuted such a proposition: "It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community."  2021 WL 1149196, at *8.  Rather, the *Munchel* Court determined that because the defendants in that case did not engage in violence, the unique circumstances of January 6, 2021 – the Certification proceedings and the large "Stop the Steal" rally – was "critical to their ability to obstruct the vote and to cause danger to the community.  Without it, [the defendants] . . . seemingly would have posed little threat."  *Id.*  In contrast, Klein's choice to use violence as a means to his ends, and his physical attack on officers protecting the Capitol and the people inside it, prove that he poses a threat regardless of the unique circumstances of January 6, 2021.  Klein's conduct "contributed to the successful disruption of the democratic process for hours while terrorizing elected officials, staff, and members of the press who sheltered inside the Capitol."  *Chrestman*, 2021 WL 765662, at *15.  Klein's danger to the community is apparent, and the United States seeks his continued detention as a result.

In sum, the defendant asks this Court to wholly ignore entire bodies of caselaw and established jurisprudence, disregard photographic and video evidence, and draw a conclusion that Klein is not a danger to the community and should be released pending trial.  Given the above assessment of all four relevant factors, however, there is clear and convincing evidence that there are no conditions or combinations of conditions – any of which may be dismissed by Klein as invalid – that could reasonably assure the safety of the community and Klein's compliance with Court orders.  Only his continued detention mitigates such grave dangers.

**4.  <u>The United States' Request to Exclude 60 Days Under the Speedy Trial Act Does Not Violate the Defendant's Substantive Due Process Rights</u>**

Finally, the defendant appears to advance an as-applied challenge to his detention under the Bail Reform Act by arguing that the "combination of insisting on Mr. Klein's pretrial detention while not being able [sic] afford Mr. Klein a speedy trial constitutes a violation of his [D]ue [P]rocess rights[.]"  (Def. Mot. at 28).  The defendant first claims that the United States is not entitled to exclude time under the Speedy Trial Act (STA), primarily objecting to the government's request for additional time to provide fulsome discovery as part of this large-scale and ongoing investigation.  The defendant additionally argues that the uncertainty created by the large-scale discovery process, in conjunction with his detention, deprives him of his substantive Due Process rights.  The Court should reject both of the defendant's arguments.

The defendant's claim that the government is not entitled to exclude time under the STA (Def. Mot. at 28-30) appears to be in response to the United States' Motion to Continue and to Exclude Time Under the Speedy Trial Act, filed on March 25, 2021.  (ECF No. 15).  In that motion, the United States requested a 60-day exclusion of time under the STA pursuant to the factors

outlined in 18 U.S.C. §§ 3161(h)(7)(A), (B)(i), (ii), and (iv).[11]  The government fully set forth its arguments for the 60-day exclusion in that motion, which is incorporated herein by reference, and will not repeat those arguments verbatim here.  In brief, the United States requested the 60-day extension to allow time to develop a system for storing and searching, producing and/or making available to defense counsel the immense amount of discovery materials that are in the government's possession across the hundreds of cases involving rioters who attacked the Capitol on January 6, 2021.

While the defendant's argument is unclear at points, he seemingly takes issue with the fact that he does not yet have discovery, the very issue at the heart of the government's request for a 60-day continuance.  With respect to discovery, the United States has worked diligently to prepare initial discovery and, as of the date of filing, undersigned counsel anticipates providing initial discovery to the defendant within ten business days.  Initial discovery will include the specific materials that the government relied on in charging Mr. Klein, as well as related materials such as the data extraction from his cell phone and the search of his vehicle.  It will not, however, include the broader collection of materials discussed in the motion for a 60-day exclusion of time, which requires specific systems and processes to be in place in order to provide those materials to opposing counsel.

Moreover, there has been no unreasonable delay in the provision of discovery.  Mr. Klein was arraigned on March 25, 2021; five days later, on March 30, 2021, counsel for the defendant consented to a protective order governing discovery; two days later, on April 1, 2021 – just four

---

[11]    As of the time of filing, the Court has not yet ruled on the United States' motion or the requested 60-day exclusion of time under the STA; the Court, however, did exclude the time between the arraignment on March 25, 2021 through the next date of April 9, 2021.

days ago – the Court issued that protective order, enabling the government to begin providing those materials.  The process is in motion and the defendant will have the materials specific to his case in short order.

The defendant also asserts, without authority, that the uncertainty created by the large-scale discovery process, in conjunction with detention, is a violation of Mr. Klein's Due Process rights. (Def. Mot. at 34).  This argument must fail based upon the Supreme Court's holding in *United States v. Salerno*, 481 U.S. 739 (1987), a case which the defendant cites, but then inexplicably dismisses.

In *Salerno*, the Court upheld the Bail Reform Act (BRA), which permits the pretrial detention of a defendant in certain limited circumstances, from a facial substantive Due Process challenge.  481 U.S. at 741.  Finding that pretrial detention under the BRA is regulatory rather than punitive, the Court relied on the fact that Congress put significant procedural safeguards in place to protect pretrial detainees.  In reaching its decision, the Court pointed to, among other things, the requirement that the detention court find by "clear and convincing evidence" that there is "no combination of conditions" that would assure the safety of the community pending trial before detaining a defendant.  *Id.* at 742-43; *citing* 18 U.S.C. §§ 3141, 3142.  The Court also noted that under the BRA, the "maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act."  *Salerno*, 481 U.S. at 747.  In making this observation, the Court implicitly validated the STA – including both the timelines *and* the permitted exclusions of time – in upholding the validity of pretrial detention.  The Court went on to clarify that "[w]e intimate no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal."  *Id.* at 747 n.4.

It appears that Klein's Due Process argument touches on the issue the Court left open in *Salerno* – whether the length of the defendant's detention is so excessive that it has become punitive rather than regulatory. Due Process does not limit the length of pre-trial detention to a one-size-fits-all duration. Instead, courts typically examine the length of detention on a case-by-case basis to ensure that a regulatory detention that is ordered pre-trial to protect the community does not become punitive over time. *See United States v. Orena*, 986 F.2d 628, 630 (2d. Cir. 1993); *see also Sharps v. United States*, 2021 WL 922468 (D.C. Mar. 11, 2021).[12]

---

[12]    The D.C. Court of Appeals recently addressed an analogous issue in *Sharps v. United* States, No. 20-CO-5542021, 2021 WL 922468 (D.C. Mar. 11, 2021). There, the Court addressed whether the D.C. Superior Court emergency COVID-19 tolling orders to extend the 100-day trial deadlines violated the substantive Due Process of detained defendants. Relying on *Salerno*, the Court found that there was no Due Process violation, even for defendants likely to be detained up to two years awaiting trial. The Court reasoned that while the pandemic may delay trial, detention was not indefinite and the defendant would have the opportunity for trial in the foreseeable future, making the detention regulatory rather than punitive. In determining that a two-year detention pending trial was not excessive, the Court noted the following instructive authorities:

> *United States v. El-Hage*, 213 F.3d 74, 81 (2nd Cir. 2000) (holding that pretrial detention lasting thirty to thirty-three months did not violate due process) (quoting *United States v. Millan*, 4 F.3d 1038, 1044 (2d Cir. 1993) (ruling that a thirty-one month pretrial detention was constitutional), and *United States v. El-Gabrowny*, 35 F.3d 63, 65 (2nd Cir. 1994) (finding that pretrial detention expected to last twenty-seven months did not offend due process)); *United States v. Briggs*, 697 F.3d 98, 103 (2nd Cir. 2012) (holding that pre-trial detention of nearly twenty-six months did not violate due process); *United States v. Hill*, 462 F.App'x. 125, 127 (2nd Cir. 2012) (same); *United States v. Vondette*, 5 F.App'x. 73, 75–76 (2nd Cir. 2001) (holding that defendant's forty-month pretrial detention did not violate due process). Usually applying the Second Circuit's tripartite test, other courts have reached similar conclusions. *See, e.g.*, *United States v. Watson*, 475 F.App'x. 598, 603 (6th Cir. 2012) (holding that approximately twenty-month period of pretrial detention did not violate substantive due process); *United States v. Gonzalez*, 995 F. Supp. 1299, 1304 (D.N.M. 1998) (holding that pretrial detention of thirty-five to thirty-seven months did not violate substantive due process); *United States v. Landron–Class*, 705 F.Supp.2d 154, 156–57 (D.P.R. 2010) (holding that twenty-nine month pretrial detention did not offend due process); *United States v. Mohammed*, 2017 WL 2365247 *6 (N.D. Ohio 2017) (holding that projected twenty-two month detention did not violate substantive due process); *United States v. Telfair*, 2008 WL 5188846 *4 (D.N.J.) (same); *United States v. Flores*, 2018 WL 3530837 *2–*3 (C.D. Cal. 2018) (holding that fifty-two month pretrial detention did not violate substantive due process); *State v. Labrecque*, 2020 WL 5268718 *7–*8 (Vt. 2020) (holding that twenty-five month pretrial detention due to COVID-19 pandemic was not constitutionally excessive).

*Sharps*, 2021 WL 922468, at *12 n.89.

In this case, Klein has been detained since his arrest on March 4, 2021, just over one month. He was afforded the procedural safeguards outlined in § 3142 and held pending trial following a detention hearing on March 9, 2021. He is scheduled to appear before the Court on April 9, 2021, for a *de novo* review of that detention determination. For Due Process purposes, Klein's detention of one month is well within the bounds of what Courts around the country have determined to be non-punitive regulatory holds. (*See* n.12, *supra*). The same would be true if the Court were to grant the 60-day exclusion of time requested by the United States.

Rather than directly address whether detention of one to three months in length violates substantive Due Process, the defendant attempts to bolster his Due Process argument by suggesting that the United States is requesting "indefinite" detention and, to date, has not "agree[d]to *any* deadline by which discovery must commence." (Def. Mot. at 28, 31) (emphasis in original). To suggest that Mr. Klein may be detained indefinitely is a misrepresentation of the government's request for a 60-day continuance. If the Court grants the United States' motion, the parties will be required to reappear before the Court in 60 days to determine the next steps. The timelines dictated in the STA will still govern the proceedings; at the end of the 60 days, the parties will either be "on the clock" to set a trial date, or will have to persuade the Court that additional exclusions of time are justified under the STA. There is no support for defendant's contention that a specific time-limited 60-day request will become indefinite. Similarly, while the government has not agreed to a specific discovery timeline – which would be foolhardy in light of the massive amount of data to be disclosed to hundreds of defendants – discovery is moving forward and, if additional time is required for that process, the United States will be required to demonstrate to the Court that any additional exclusions of time are consistent with the STA.

The Court should reject the defendant's STA arguments.  The United States has provided valid authority and argument to support its request for a 60-day exclusion of time under the STA. Furthermore, the defendant's detention under the BRA is consistent with both the deadlines and the exclusions provided in the STA, making his detention regulatory in nature.  The brief length of Klein's detention to-date is non-punitive and does not violate substantive Due Process.

## Conclusion

WHEREFORE, the United States respectfully requests that the Court deny the defendant's motion to revoke the order of detention, and grant the United States' motion to exclude time.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By: /s/ *Kimberley C. Nielsen*
KIMBERLEY C. NIELSEN
JOCELYN BOND
Assistant United States Attorneys
N.Y. Bar No. 4034138
555 4th Street, N.W., Room 9913
Washington, D.C. 20530
202-252-7418
Kimberley.Nielsen@usdoj.gov
Jocelyn.Bond@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I caused a copy of the foregoing opposition to be served on counsel of record via electronic filing.

/s/ *Kimberley C. Nielsen*
KIMBERLEY C. NIELSEN
Assistant United States Attorney

33