UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | |
|---|---|
| UNITED STATES OF AMERICA, | . |
| | . |
| Plaintiff, | . CR No. 21-0236 (JDB) |
| | . |
| v. | . |
| | . |
| FEDERICO GUILLERMO KLEIN, | . Washington, D.C. |
| | . Tuesday, July 13, 2021 |
| Defendant. | . 11:34 a.m. |
| . . . . . . . . . . . . . . . | . |


TRANSCRIPT OF STATUS HEARING
VIA VIDEOCONFERENCE
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:         JOCELYN P. BOND, AUSA
                            KIMBERLEY C. NIELSEN, AUSA
                            U.S. Attorney's Office
                            555 Fourth Street NW
                            Washington, DC 20530
                            (202) 252-7566

For the Defendant:          STANLEY E. WOODWARD, JR., ESQ.
                            Brand Woodward Law
                            1808 Park Road NW
                            Washington, DC 20010
                            (202) 996-7447

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001
                            (202) 354-3186



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                     P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have Criminal

3     Action 21-236, United States of America versus Federico Klein.

4     We have Ms. Jocelyn Bond and Ms. Kimberly Nielsen representing

5     the government.  We have Mr. Stanley Woodward representing the

6     defendant.  I would ask anyone else to please identify

7     yourselves for the record.

8          OFFICER SHUCK:  Good morning, Your Honor.  Christine

9     Schuck from Pretrial Services for the District of Columbia.

10          THE COURT:  Good morning.

11       All right.  And good morning to everyone.  We're here on

12     a status call with respect to this matter.  We've got a couple

13     of things to address but perhaps some things that we cannot yet

14     address.  Let's talk about the status of the case before we get

15     into some of these other things.

16       So, Ms. Nielsen or Ms. Bond, tell me where we stand with

17     respect to discovery and any plea offers and, from your view,

18     where we're headed.

19          MS. BOND:  Thank you, Your Honor.  Since the last

20     hearing, we have continued to provide Mr. Klein with all of

21     the discovery that he is entitled to.  As we identify new

22     information, we are turning that over to him.  We are also

23     making progress on the big data discovery that we frequently

24     mention.  In fact, we filed a notice yesterday detailing

25     everything that we've provided thus far as well as all the

efforts that my office has made on a larger scale to provide
that big data discovery, where we are as far as getting it
uploaded and getting access to that, and the processes that
are being developed for that.

We have been in discussions with defense counsel, and
our expectation, based our conversation with defense counsel,
is they intend to ask for a trial date to be set.

In our discussion, we had discussed a trial date either
next spring or next summer, and we don't oppose setting a trial
date out at that time period because we believe that we will be
able to meet our discovery obligations well in advance of any
trial date that's set next spring or summer.

So we are amenable to setting that trial date at that
point.  We would oppose any sort of short turnaround trial
date not because we do need additional time to provide that big
data discovery as we described in the notice that was filed
yesterday.

THE COURT:  So what is the notice -- and it's not
unique to the notice in this case; it's the notice that's being
filed in many cases.

MS. BOND:  It is.

THE COURT:  The notice is loudly silent with respect
to the timeline.  It sort of avoids coming to any conclusions
with respect to when the government believes that the, as you
put it, big data discovery will be provided.  Can you provide

1   me any greater specificity with respect to that question?

2           MS. BOND:  I cannot, Your Honor.  I'm not in the

3   position to do that.  But our discovery team is aware that

4   judges and defendants want to move these cases along, that trial

5   dates are now being set, and I cannot provide you a timeline.

6   But we are aware that we need to move quickly, and they are

7   working as expeditiously as possible.

8           THE COURT:  All right.  Well, "all right" is the wrong

9   word.  I'm not going to say "all right."

10          MS. BOND:  And I do want to mention that it is always

11  ongoing.  It will probably be ongoing up to any trial date that

12  Mr. Klein has.  That is because arrests continue to come.  So

13  every day we are generating brand-new discovery that Mr. Klein

14  may be entitled to.

15          THE COURT:  Well, that's a frightening prospect if

16  there's any *Brady* or *Giglio* or Jencks material, because what

17  you're saying is that that material will be discovered right up

18  until trial and provided.  And if any of it does fall into the

19  category of *Brady*, *Giglio*, or Jencks, you're going to have big

20  problems on your hands, and so am I.

21          MS. BOND:  Hence the absolute need for the ability

22  to provide that discovery to defense counsel.  It can't be

23  haphazard, and we know that.  And it can't be dumped on them,

24  and we know that.  That is why we have contracted with Deloitte

25  to build this system to provide this discovery so that everybody

has the ability -- we have the ability to meet our obligations
and Mr. Woodward has the ability to be an effective defense
attorney.

THE COURT:  All right.  And you've said what you're
going to say with respect to a plea offer.  Your estimation is
that there is not likely to be an agreement in that arena.

MS. BOND:  So that is our understanding from
Mr. Woodward.  We did extend a plea offer.  I believe that he
did want to have additional conversations with his client, but
our understanding is that that is not something that is likely
to happen.

THE COURT:  All right.

Mr. Woodward, why don't we turn to you for a moment.

MR. WOODWARD:  Can you hear me, Judge?

THE COURT:  I can.

MR. WOODWARD:  Good morning, Your Honor.

We don't disagree with the proffer that's been made by
the government.  Progress has been made.  We have received
additional discovery.  Our position with respect to a trial
date is we feel somewhat hamstrung about what, if anything,
we're supposed to be doing.  We don't have, as you point out,
concrete information about when we can expect the data and/or
what the process for providing us with the data, what it's going
to look like.  There's just a lot of unknowns right now about
the government's obligation to provide us with material.

1    In addition, we disagree about what the government's

2    going to be required to give us.  We had a productive

3    conversation together about what this was going to look like

4    and what obligations the government would have to identify

5    certain information, including videos that they purport to

6    depict Mr. Klein regardless of whether they're going to utilize

7    that video at trial.

8    But we also agree that it's really difficult, if not

9    impossible, for the government to take a position today as to

10   what they're going to even be capable of doing until they have a

11   better sense of what this database is going to allow them to do.

12   So when the concept of setting a trial date came up, that

13   seemed to defense to be the only mechanism to put some real

14   deadlines on when we can expect to receive information in

15   advance of the trial.

16   THE COURT:  All right.  And I understand that.

17   I understand that you are somewhat hamstrung, as is the Court,

18   and perhaps frustrated as well.  But where does that leave you?

19   Let's assume we're going to set a trial date.  The government

20   is suggesting that a trial date be set in the spring or summer

21   of 2022.  What does the defense request?

22   MR. WOODWARD:  Well, that's going to largely depend

23   on what the government's going to be obligated to do vis-a-vis

24   this database.  So, for example, if the government would

25   represent to the Court that a government agent, that a member of

1    the prosecution team, is going to be reviewing the video data

2    in particular that is uploaded to this database and then making

3    identification of individuals in that data, our position would

4    be that they're obligated to tell us if they are identifying

5    anyone that they purport to be Mr. Klein.

6        The government, to be clear, does not disagree with that.

7    They're just not in a position to be able to commit to doing

8    that until they have a sense of what that database is and what

9    they're going to be doing vis-a-vis the database.

10       Now if, on the other hand, the government and the defense

11   were to agree that this database was going to be dumped on

12   defense counsel, all of us in these now 500-plus cases, and

13   that we individually have an obligation to review all of the

14   information in that database so we can zealously advocate on

15   behalf of our clients, well, I think Your Honor also will

16   appreciate that I'm going to need some time to do that.

17       The government has represented to me yesterday that there

18   were at least 2,000 hours of just body-worn camera being

19   uploaded to this database.  Well, that's an entire year of

20   billable hours.

21       So it's difficult for us to understand -- it's difficult

22   for us to tell Your Honor when we would be ready to proceed to

23   trial without knowing what our responsibility is going to be

24   in advance of trial and what the government's obligation's going

25   to be with respect to this database and what they'll have an

obligation to tell us as part of their Rule 16 and *Brady*

obligations.

THE COURT:  So, Ms. Bond, Ms. Nielsen, what's your

reaction to that?  I do think that Mr. Woodward has a point.

If there are 2,000 hours -- let's just assume that that's an

accurate figure -- and the government is not going to do any

review of those and it's going to be dumped on each defense

counsel in these various cases to review and find whatever they

think relates to their particular client, we're going to have a

lot of time on our hands and a lot of cost, effort, and expense

on the defense counsel's backs.

Is there any possibility of the government doing something

that's going to be a more efficient process?

MS. BOND:  So, first of all, there will be no dumping.

We're not going to just dump all of this information on all

of these defense counsel.  We know that that would be insane.

What we are doing and what is taking the time is working with

Deloitte to make this a usable process.  There will be some

ability to search.  There are efforts being made to --

THE COURT:  How could you search for a face?  You

think there's going to be an ability to search for a face?

MS. BOND:  Your Honor, I am not going to speak to

that directly.  I know that Deloitte is working on processes

to make it at least searchable.  I do not know if faces will

be searchable.  There has been a lot of human effort to search

1   for faces; but that is imperfect, just as any process is

2   imperfect.  And certainly Ms. Nielsen and I cannot watch every

3   moment of this video to clip for Stanley all the times we see

4   Mr. Klein.  That is why Deloitte is building this process,

5   building this database, to make it sensible for everyone.

6        We agree with Mr. Woodward, he should not have all of this

7   discovery dumped on him.  Our office knows that we have to meet

8   obligations to make it reasonable for defense counsel to find

9   what they need, and that's what the goal is.  That's why it

10  wasn't done last February.

11       THE COURT:  Is the U.S. Attorney's Office meeting with

12  representatives of the defense bar --

13       MS. BOND:  Yes.

14       THE COURT:  -- to try to work out an approach that

15  will be used across the board, assuming that all defense counsel

16  agree to it, across the board for these cases to address this

17  problem of who's going to be reviewing and looking for video as

18  to particular defendants, given the fact that if a human review

19  of the entirety of, let's assume again 2,000 hours of video

20  is to be done for each defendant, that's going to be, as

21  Mr. Woodward said, a year's worth of effort for someone to

22  complete.

23       MS. BOND:  And the answer, Your Honor, is 100 percent

24  yes.  Our office has been in contact with the Federal Public

25  Defender Service regularly since the beginning.  They have

1   regular meetings.  FPD is also -- we touched on this in our

2   notice, that FPD is exploring whether they can move forward on

3   some sort of database to host all of these materials, not only

4   just for the Federal Public Defender here in D.C., but all

5   over the country as well as CJA panel attorneys and retained

6   attorneys whose clients are not able to financially -- permit

7   a retained attorney to access these materials.

8        So, yes.  FPD is spearheading what they need to do to

9   allow the defense bar to use this material.

10           THE COURT:  And so has the court writ large,

11  not just this judge, been advised of the status of those

12  discussions?  Not the notice that you filed with respect to

13  providing at least some information.  I won't say that it's all

14  the information that I would desire, but some information as to

15  the status of the vendor's efforts, Deloitte's efforts, and

16  where things stand.  Has anything been provided to the court

17  with respect to these discussions between FPD representing the

18  defense bar and the U.S. Attorney's Office on the possibility

19  of a sane approach here?

20           MS. BOND:  I don't know the answer to that, Your

21  Honor.  I am not privy to those upper-level discussions, but

22  I can certainly inquire about that issue.

23           THE COURT:  And I don't want to jump the gun and start

24  managing that if something is already taking place in terms of

25  informing the court, but on the other hand, it is in no one's

1    interest -- not the U.S. Attorney's Office, not the individual

2    assistants handling cases, not the defense bar or the individual

3    lawyers handling cases for the defense or the courts or

4    individual judges -- it's in no one's interest to be in the dark

5    and sort of be struggling with this.  I think that it would make

6    sense for the court to be advised of where things stand so that

7    individual judges don't start going on the warpath.  And believe

8    me, that will happen before too long.

9         MS. BOND:  Understood, Your Honor.

10        THE COURT:  Not necessarily for myself, but I'm

11   speaking from experience.

12        MS. BOND:  I will absolutely pass that message along.

13   Completely understood.

14        THE COURT:  All right.  Well, so now what do we do

15   here?  Are we in a position, Mr. Woodward, where we should set

16   a trial date and have another status in, let's say, 60 days?

17   Is that where you think we are?

18        MR. WOODWARD:  I'm fine with that.  I think maybe

19   60 days might be a little too long.  I just think, Your Honor,

20   to piggyback on what you just observed, if these discussions

21   are happening -- I realize that I'm but one person with one

22   client, but the fact that those discussions are happening is

23   not trickling down to defense counsel.

24        So the Federal Public Defender's Office has created an

25   extremely useful listserve in which every attorney who enters

1    an appearance on behalf of the more than 500 defendants is

2    added to that listserve.  There's a lot of information being

3    communicated, and there's been zero discussion with those

4    counsel about this process.

5         And so it may very well be that somebody senior at the

6    Federal Defender's Office and somebody senior at the U.S.

7    Attorney's Office are having discussions, but I'm having a

8    hard time believing that it's going to be an agreeable process

9    when not everybody is included.

10         I'm very leery of setting a trial date when I don't know

11   what my position as defense counsel for Mr. Klein is going to

12   be in advance of that trial date.  We can set it for a year out,

13   but even then it's unclear to me whether I'll be reviewing 2,000

14   hours of video or not.

15              THE COURT:  I understand, Mr. Woodward.  But I think

16   we ought to set a trial date, put a little pressure on this

17   case, and stay in touch with each other and see where we go.

18              MR. WOODWARD:  Sure.

19              THE COURT:  So the government is suggesting that it

20   thinks this will all be sorted out in time to have a trial in

21   the spring.  Is that correct, Ms. Bond?

22              MS. BOND:  Yes, Your Honor.  And, to be clear, that

23   was the time frame that Mr. Woodward suggested yesterday as

24   amenable for his trial schedule as well as co-counsel's trial

25   schedule, and we believe it is realistic to take this to trial

1    at that time.

2            THE COURT:  All right.  What does the term "the

3    spring" mean?  March, April, May, June?  April?

4            MS. BOND:  That is what I recall coming up in our

5    discussion yesterday.  I am available in April.

6            MS. NIELSEN:  I'm sorry to jump in, Your Honor.

7    I believe our discussion yesterday was later in the summer.

8    My understanding was that Mr. Woodward's co-counsel,

9    Ms. McGough, has a very large, multiple-codefendant homicide

10   trial that's going to take up most of the summer.

11       I myself am not available until May due to my own trial

12   schedule in Superior Court, and I know Mr. Woodward also

13   indicated that.  So I actually didn't think it was as early as

14   April.  I understood it to be later than that.  I know I will

15   not be available in April.

16           MS. BOND:  And I know that Mr. Woodward was going to

17   consult Ms. McGough's trial schedule for today.

18           THE COURT:  Well, I'm getting a little bit of confused

19   signals.  I didn't understand the dates.  If Ms. McGough is busy

20   with a multiple-defendant case that's going to take up most of

21   the summer -- you're talking about the summer of 2022?

22           MS. NIELSEN:  Yes.

23           MR. WOODWARD:  Yes, Your Honor.

24           THE COURT:  So where does that leave you, Mr. Woodward?

25           MR. WOODWARD:  Potentially not until later summer as

Ms. Nielsen suggests that we would both be available for the trial.  And so -- now, again, all of this depends on what my obligation as defense counsel is going to be --

THE COURT:  Well, forget about that for a second.  For a second.  I know it's difficult to, but set that aside for a second, and let's assume that we're operating -- you're going to have a lot of work to do, but it may not be insurmountable.  The question is, scheduling-wise, spring was thrown out to me, but now I'm being told late summer.

MR. WOODWARD:  Yes.  I mean, Your Honor, respectfully, I just don't think it is realistic that the government will be prepared to try all of these cases in the spring.  So we'll accept a trial date, and I'll be ready; but I just don't know that that would be reasonable, and I would have to reserve the ability to request a continuance if in fact a database is dumped on us between now and then.

THE COURT:  Well, let's be realistic here.  There are things that we don't know.  We don't know how many cases are going to trial.  We don't know how many of those cases will involve detained defendants, who will get first priority in terms of trials.  So there's a lot of unknowns floating around out there.  All we can do is make our best estimates as to when this case can go to trial.

So, Mr. Woodward, are you suggesting that we set a late-summer 2022 trial date?

1          MR. WOODWARD:  I think, yes, Your Honor.  I think

2     actually it would be my preference to set a trial date in

3     September of '22.

4          THE COURT:  And Ms. Bond and Ms. Nielsen, what's

5     your reaction?

6          MS. BOND:  I'm wide open in September of 2022.

7          MS. NIELSEN:  I am checking my schedule right now,

8     Your Honor.  I believe I'm also wide open; I'm just trying

9     to confirm that.  Yes.  I am wide open in September of 2022.

10          THE COURT:  Well, unfortunately, my calendar for

11     September of 2022 is not complete in terms of some other

12     obligations that I have.  I have a long-standing obligation

13     with respect to the Judicial Conference of the United States

14     that I have to attend every year, but I don't know when that

15     is in September of 2022.  But let's just pick a time.

16        How long do you think the government's going to take to

17     present its case?

18          MS. BOND:  So, Your Honor, it's a bit of an educated

19     guess because none of these have gone to trial.  I would hope,

20     based on experience, that we could do this in well under a week.

21     I think three days of the government's case-in-chief should be

22     sufficient.  So perhaps a week for trial including the picking

23     of the jury and any defense case.

24          THE COURT:  What do you think, Mr. Woodward?  Do you

25     think a week for trial is a decent estimate?

1        MR. WOODWARD:  We do, Your Honor.

2        THE COURT:  All right.  So it's going to either

3   have to be the week of the 11th or the week of the 18th.

4        What I'm going to do is set it at this moment for both

5   weeks; then I'm going to check on my schedule with respect to

6   these other obligations and let you know which of those two

7   weeks it will be.

8        MS. BOND:  Thank you, Your Honor.

9        THE COURT:  So we'll block out both the week of

10  September 11 and the week of September 18, one of those weeks

11  being the week that we will settle on in the next couple of

12  days.  I will just have to check the calendars to make sure

13  which is the better week for me.

14       All right?  So that's our trial date.  Or that's our

15  approximate trial date.  In the meantime, let's talk about --

16  I'm sorry.  I said the 11th and the 18th, but I guess that was

17  2023.  I guess it's the 12th and the 19th in 2022.

18       MS. BOND:  Yes, Your Honor.

19       THE COURT:  So those two weeks.

20       In the meantime, when should we next get together?

21  Mr. Woodward thinks 60 days might be a little too long.  I don't

22  think I've heard from you, Ms. Bond and Ms. Nielsen, on that.

23       MS. BOND:  I am requesting 60 days.  I think we will

24  have a lot more answers to give Your Honor in 60 days than we

25  will in 30 days.  It has not been a short process, and that's

1    because of how much data there is, and I know the lingering

2    questions predominantly have to do with that big data discovery.

3         THE COURT:  I think -- given the fact that we're not

4    going to be trying this case until September of 2022, I think

5    60 days is appropriate here.  It's July now.  That's going to

6    bring us to -- I mean if I did it in 45 days, it would be the

7    very end of August, and maybe it's better to push this into

8    September anyway.

9         So back to 2021, September of 2021, I'm in trial the week

10   of September 20th, and I'm tied up pretty much most of the

11   preceding week and then again some of the following week.

12   So maybe we'll do it at the end of the first week of September.

13   How about Wednesday, September 8?

14         MS. BOND:  That's fine for me, Your Honor.

15         MS. NIELSEN:  What time would that be, Your Honor?

16         THE COURT:  Well, I have a ten o'clock matter, so

17   could we do this at eleven o'clock?

18         MS. NIELSEN:  That's perfect.  Thank you.

19         THE COURT:  Mr. Woodward, would that work?

20         MR. WOODWARD:  Does Your Honor expect it to be virtual

21   or in person, or we just don't know?

22         THE COURT:  I have no expectations at this time,

23   Mr. Woodward, other than the fact that we'll schedule it to be

24   virtual because we can do this proceeding, with the defendant's

25   consent, on video.

1          MR. WOODWARD:  Okay.

2          THE COURT:  A sentencing or plea and certainly a trial

3    cannot be conducted on video once the reason for it, which is

4    the CARES Act declaration, expires.  But we're not at that point

5    yet for those kinds of proceedings.  But this kind of proceeding

6    there is latitude to do it virtually even after that under

7    certain constraints, but only with the defendant's consent.

8       So as long as you consent -- and it may be more convenient

9    for Mr. Klein in any event.  As long as you consent, we can

10   schedule this to be virtual on September 8 at 11 a.m.  Is that

11   acceptable to everyone?

12         MS. BOND:  Yes, Your Honor.

13         MR. WOODWARD:  Yes, Your Honor.

14         THE COURT:  So be it.  Now that moves us to, first,

15   speedy trial.  Where do we stand, Mr. Woodward, on yours and

16   your client's agreement to exclude the time through our newly

17   scheduled date of September 8 from the speedy trial calculation?

18         MR. WOODWARD:  So I have not consulted with my client

19   about waiving it through the trial date.

20         THE COURT:  No, not through the trial date.  Just

21   through September 8.  I'm not going to jump to the trial date

22   yet; September 8 being the status that we've set, not the trial.

23         MR. WOODWARD:  So long as Mr. Klein remains released,

24   the defense will consent to a tolling of the Speedy Trial Act

25   through September 8.

1      THE COURT:  Mr. Klein, do you feel that you need

2   to discuss that with Mr. Woodward, or are you in agreement

3   with that?

4      THE DEFENDANT:  I'm in agreement.

5      THE COURT:  All right.  With the consent of the

6   defendant and his counsel and with the agreement, I take it,

7   of the government, Ms. Bond?

8      MS. BOND:  Yes, Your Honor.

9      THE COURT:  I find that the for the reasons that have

10   been discussed here today regarding discovery and preparation

11   for any trial in this matter, that the interests of justice

12   outweigh the interests of the defendant and the public in a

13   speedy trial, and therefore the time between now and our newly

14   scheduled status on September 8th of 2021 will be excluded from

15   speedy trial calculation, and I so order.

16      That brings us to the two other matters.  First on return

17   of property with respect to both the iPhone and the dashboard

18   camera, the government has not had a chance to respond to that

19   yet.  Does the government wish to file a written response?

20      MS. BOND:  We do, Your Honor.  May we have two weeks

21   to respond?

22      THE COURT:  I think that's reasonable.  Two weeks.

23   And you want a week after that, Mr. Woodward, to file any reply?

24      MR. WOODWARD:  Thank you, Your Honor.  Yes.

25      THE COURT:  And then with respect to the PSA report

1   violations, I don't think I need to hear from Ms. Schuck on

2   this because I think it's pretty clear what the position of

3   Pretrial Services is, and that is two categories of violations.

4        One is a late return -- and this is not the first instance

5   of such a violation, although this was only 18 minutes late,

6   returning from a Catholic service; and the second relates to

7   drug testing, and it's a lot more complicated in terms of what

8   has or hasn't happened.

9        There's been a response filed by the defense.  I don't know

10  that the government has had access to that yet because it was

11  filed under seal, and I had to issue an order permitting it to

12  be filed under seal and another order permitting the government

13  to have access to it.  So I don't know that the government has

14  actually gotten access to that yet.

15       Have you, Ms. Bond and Ms. Nielsen?

16            MS. BOND:  We have.  Mr. Woodward provided it to us

17  directly.

18            THE COURT:  Okay.  I mean, this seems to me to be --

19  I sense that this is in the category of the second strike, and

20  you're not going to get a third strike except under circumstances

21  that you're not going to be comfortable with, Mr. Klein.

22       But it seems to me that some explanations have been

23  provided.  The 18 minutes late is simply a failing on behalf of

24  the defendant.  It's of a serious nature, but not that serious,

25  not serious enough to warrant the kind of remedy that's being

1    proposed.

2         What's happened with respect to the drug testing, I mean,

3    again, this falls on the defendant's shoulders.  You know, the

4    problem that -- yes, it's a difficult system to deal with, but

5    the problem is ultimately one that defendants all over the

6    country, in numbers of thousands, have to deal with these

7    systems, and if they don't, there are consequences.  And

8    Mr. Klein is not someone who is unable to navigate the world.

9         He's an accomplished individual, and he can navigate

10   the system; and to read the response indicates that some of

11   the failings here were not because of the system, but because

12   of Mr. Klein's failings.

13        And again I would say, however, that it does not strike

14   me, since he seems to have been trying, albeit stumbling on

15   occasions, but he's trying to be in compliance.  It seems to

16   me that this is not serious enough to change the conditions

17   at this time.

18        So what I'm inclined to do -- and I want to hear any

19   reaction to it.  What I'm inclined to do is to say these are

20   violations.  I don't think an adequate explanation has been

21   provided to make them not violations.  It's mitigating

22   information or explanatory information, but it doesn't mean

23   that they aren't violations, and it doesn't mean that they

24   aren't violations for which at least some responsibility is on

25   the defendant's shoulders.  But they are not violations that I

1    find warrant the change of conditions that is being proposed.

2         Instead, I would be inclined to say to Mr. Klein, this

3    is the second occasion that such violations have been brought

4    before me.  If there is a third occasion, there will be serious

5    consequences; but for now I'm prepared to say, No. 1, don't be

6    late reporting back, because if you are, that's going to result

7    in some consequences; and No. 2, get your act together in terms

8    of calling for and appearing for drug testing because again --

9    and this is more serious -- if you don't, you're going to face

10   consequences from the Court, including perhaps the consequence

11   that is being recommended by Pretrial Services.

12        So with that observation by me, let me hear any reaction to

13   it, and first I think I need to give the courtesy to Pretrial

14   Services.  Ms. Schuck?

15        OFFICER SCHUCK:  Good morning, Your Honor.  Christine

16   Schuck, Pretrial Services.  Pretrial Services will note for Your

17   Honor that Officer Wilson from the Eastern District of Virginia

18   is also present on the call, if Your Honor would like to hear

19   from Officer Wilson, who is actually directly supervising

20   Mr. Klein.

21        THE COURT:  I'm happy to hear if there's some useful

22   information to provide.  Go ahead.

23        OFFICER SCHUCK:  I would defer to Officer Wilson, if

24   she would like to provide additional information since she is

25   the one directly supervising Mr. Klein, but Pretrial Services

1  for the District of Columbia is going to defer to our

2  recommendation as stated in the report for the reasons outlined

3  in the report.

4  　　　　　THE COURT:  Ms. Wilson, do you have anything further

5  you would like to add?

6  　　　　　OFFICER WILSON:  My concern, Your Honor, is that

7  Mr. Klein isn't taking this seriously.  Whenever there's a

8  violation, there's also an explanation, but the bond conditions

9  that Your Honor has laid out are fairly simple and straightforward.

10  　　　And as Your Honor pointed out, he's a very accomplished

11  person.  These are things that other defendants on Pretrial

12  Services deal with every single day.  So I'm not sure what the

13  disconnect is when it comes to Mr. Klein in complying with the

14  conditions of his release.

15  　　　　　THE COURT:  All right.  I think that's well stated.

16  Anything from the government?

17  　　　　　MS. BOND:  Yes, Your Honor.  The government would like

18  to make a record here that we fully support Pretrial's request

19  to put Mr. Klein on home incarceration.

20  　　　And Your Honor put this in terms of this being his second

21  strike, but the government submits this is truly his third

22  strike since being on home confinement because, at last hearing,

23  he got drunk at his mother's house and failed to come home on

24  time.

25  　　　Now since the last hearing 30 days ago, he has two

1   additional violations, one on the 15th of June and one on the

2   11th of July.  And I understand Your Honor's perspective about

3   the being 18 minutes late coming home from mass being sort of

4   a low-level violation, but he was 18 minutes late because he

5   decided to join a social after the mass.  It wasn't just

6   attending mass, but he was out in the community doing social

7   activities.

8         And Mr. Klein's ability to follow court orders and follow

9   the law, we have consistently said that he is either unable or

10  unwilling to do that.  And he demonstrated that by his alleged

11  actions on January 6, where he violated the law right in front

12  of dozens of police officers and now is repeatedly violating

13  while on home confinement.  So we fully support Pretrial's

14  request, and our position is that his inability to comply here

15  goes ultimately to his dangerousness.

16              THE COURT:  All right.  Mr. Woodward.

17              MR. WOODWARD:  Thank you, Your Honor.  I have to say

18  that the defense is very disappointed that, despite the efforts

19  that both Pretrial and the defense have undertaken in order to

20  keep certain information under seal, that the government would

21  simply recite it over the a public line like this.

22        And so we'd like to say also for the record that the

23  allegation was not that Mr. Klein was drunk at his mother's

24  house, but rather that he had had something to drink and was

25  concerned about driving home safely.  And so the outreach that

1    he made to the pretrial officer was in that regard.

2         Otherwise, we have nothing to say other than the government

3    has not established from the date of the detention hearing to

4    the present that Mr. Klein presents a danger to the community

5    or to any other individual.  I think Your Honor has recognized

6    that, and that's the position of the defendant as well.

7         THE COURT:  All right.  With respect to dangerousness,

8    I understand that there is an argument that failure to abide by

9    rules and conditions does relate to dangerousness, but the

10   failures here themselves do not exhibit any dangerousness.  It's

11   not a failure by virtue of using drugs.  It's not a failure by

12   virtue of going off and doing something that he is not permitted

13   to do or for some lengthy period of time.

14        So these violations, while serious and perhaps reflective

15   of Mr. Klein's unwillingness or inability to pay sufficient

16   attention to his obligations is troublesome and worrisome for

17   the Court, they do not directly reflect any dangerousness to

18   the community, and I cannot so conclude.

19        So I'm going to do what I indicated that I'm inclined to

20   do, and that is give Mr. Klein a serious -- it's another

21   warning.  It's a serious warning.  It's a promise, indeed, that

22   if he doesn't get his act together and be in full compliance,

23   I'm going to take action.  There are going to be consequences.

24        You're not going to be able to avoid those consequences

25   simply by saying, oh, I'm trying, or the system's too hard to

1    work with, or I forgot the time and was a little late.  There's

2    enough now accumulated with respect to such occurrences that in

3    the future they're going to be dealt with through more than just

4    a warning.  And you need to be aware of that, Mr. Klein, and you

5    need to be comporting your conduct in accordance with that.

6         So there will be no change in the conditions at this time

7    even though I find that these were violations and they were

8    violations for which Mr. Klein bears at least some significant

9    responsibility.

10        With that, is there anything else that we need to address

11   here today, Ms. Bond and Ms. Nielsen?

12             MS. BOND:  Nothing from the government, Your Honor.

13             THE COURT:  Mr. Woodward.

14             MR. WOODWARD:  Nothing from the defendant, Your Honor.

15             THE COURT:  All right.  I am going to undertake to do

16   a little bit of an examination by reaching out on the general

17   question that we discussed with respect to what are the plans

18   between Federal Public Defender and the U.S. Attorney's Office

19   with respect to review of the global videos, this data set of

20   videos, and who's going to be responsible for doing what with

21   them and how long is that likely to take.  I may not get very

22   far, but perhaps I'll have more information by September 8.

23        But I would encourage, Ms. Bond, you to do what you can on

24   your own to find out if there is anything meaningful going on

25   between the Federal Public Defender as representatives of the

1    defense community and the U.S. Attorney's Office on that issue.

2               MS. BOND:  Certainly, Your Honor.

3               THE COURT:  All right.  With that, Mr. Klein, I hope

4    you've heard clearly what I've said.  You're on release under

5    the same conditions you've been under.  Let me repeat: You need

6    to comply with those conditions.  A failure to do so from this

7    point out is likely to subject you to serious consequences.

8          Secondly, you have a new court date, September 8, at 11 a.m.

9    You need to be present for that.  It's anticipated that that

10   will be by video.  Unless you hear otherwise, you need to be

11   here for that proceeding, and a failure to appear could subject

12   you to independent criminal consequences.

13         And lastly, I need to advise you that if you were to commit

14   a crime while on release under your conditions, you could be

15   subject to more serious consequences for that offense than you

16   otherwise would face.  With those admonitions and that stern

17   warning, I think we are done for today.

18         Thank you all very much, and we'll see you again on

19   September 8.

20              THE DEFENDANT:  Thank you, Your Honor.

21         (Proceedings adjourned at 12:16 p.m.)

22

23

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter. *

_/s/ Bryan A. Wayne_
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance with U.S. District Court standing order(s) during the COVID-19 pandemic.  Transcript accuracy may be affected by the use of electronic technology, including but not limited to sound distortion or audiovisual interference.